1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    RICKY GODFREY,                          Case No. 25-cv-03462-AMO

8                    Plaintiff,

                                             **ORDER GRANTING IN PART AND**
9           v.                               **DENYING IN PART DEFENDANTS'**
                                             **MOTION TO DISMISS**
10   DENNIS TRUJILLO, et al.,
                                             Re: Dkt. No. 21
11                   Defendants.

12

13          In 1993, Plaintiff Ricky Godfrey was convicted of murder and attempted robbery, and was

14   sentenced to life in prison without the possibility of parole.  Godfrey spent 31 years incarcerated

15   before those convictions were vacated, and in 2023, he was resentenced to a term of 24 years.  As

16   he had already served 31 years pursuant to his original sentence, Godfrey was released.  Under

17   42 U.S.C. § 1983, he brings this suit against the detectives who investigated his crime of

18   conviction and the City of Richmond, California, for violating his constitutional rights.  Godfrey

19   asserts four claims: 1) the detectives violated due process by fabricating evidence against him in

20   the original investigation; 2) the detectives committed a *Brady* violation by failing to produce

21   exculpatory evidence; 3) the detectives failed to intervene to prevent any of the constitutional

22   violations suffered by Godfrey; and 4) the City of Richmond—as a matter of custom, policy, or

23   practice—failed to discipline police officers to deter their fabrication of evidence, coercion of

24   witnesses, and suppression of exculpatory evidence.  Defendants Dennis Trujillo, Denis Browne

25   (now deceased and represented by his successor in interest, Terry Browne), and the City of

26   Richmond move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), and to

27   strike certain allegations under Rule 12(f).

28   //

United States District Court
Northern District of California

Having considered the parties' submissions, and with the benefit of oral argument heard on July 10, 2025, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss and **DENIES** the motion to strike.

## FACTUAL ALLEGATIONS

### A.    Investigation of the July 13, 1992 Murder of Harvey Norfleet

The Complaint recites the following allegations.[1]  In the early morning of July 13, 1992, Godfrey was driving around Richmond, California, with Melvin Holman.  (ECF 1 ¶ 65.)[2]  Holman and Godfrey picked up Michael Cannon, a friend of Holman, and the three continued to drive to various locations.  (*Id.* ¶¶ 69-70.)  They then met up with Antoine Featherstone, who also joined them in the car.  (*Id.* ¶ 71.)  At around 11:30 a.m., the four men encountered a van driving toward them, and Cannon recognized Harvey Norfleet in the vehicle.  (*Id.* ¶¶ 73-74.)  He stated Norfleet owed him some money, and Holman, who was driving, honked his horn.  (*Id.* ¶¶ 74-75.)  Norfleet's van came to a stop—Rosheneda Pierce was seated in the passenger seat.  (*Id.* ¶ 79.)  Holman, Cannon, and Featherstone exited the car while Godfrey remained behind, rolling a joint.  (*Id.* ¶¶ 81-83.)  Holman approached the van, wearing a black beanie and holding a handgun, announcing that it was a robbery.  (*Id.* ¶¶ 83-86.)  Norfleet attempted to drive off when Holman fired into the vehicle, killing him.  (*Id.* ¶ 88.)  Holman, Cannon, and Featherstone, returned to their car, rejoining Godfrey, and drove off.  (*Id.* ¶ 91.)  Holman told the other three that they should not tell anyone what happened before dropping them off at their respective homes.  (*Id.* ¶¶ 94-98.)  Later that day, Holman contacted Cannon, and the two met up, at which time Holman threated to kill him if he identified Holman as the shooter.  (*Id.* ¶¶ 99-102.)  Instead, he instructed Cannon to say Godfrey was the shooter, should the police contact him.  (*Id.* ¶ 104.)

Defendants Dennis Trujillo and Denis Browne began investigating the homicide shortly thereafter.  (*Id.* ¶ 107.)  They interviewed Pierce about the shooting, and she recognized Cannon as

---

[1] This section comprises the well-pleaded allegations from the Complaint, which are taken as true and viewed in the light most favorable to Plaintiff for the purpose of the instant motion.  *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

one of the men who approached the vehicle.  (*Id.* ¶ 111.)  She did not recognize the shooter but provided the police with a physical description.  (*Id.* ¶ 112.)  On July 15, the detectives detained Cannon for questioning.  (*Id.* ¶¶ 120-21.)  Thereafter, the detectives began the interrogation before turning on the tape recorder, and Cannon—at that time—stated he did not know who the shooter was.  (*Id.* ¶¶ 121-22.)  Cannon asked if he could speak with a lawyer, but the detectives pressed forward with their questions.  (*Id.* ¶ 124.)   They told him he could be charged as an accessory to murder and spend his life in prison if he did not identify the shooter.  (*Id.* ¶¶ 124-26.)  Following this exchange, Cannon stated Godfrey was the shooter.  (*Id.* ¶ 129.)

Using an older photo of Godfrey, the detectives created a photo lineup, which they showed to both Pierce and Cannon, individually.  (*Id.* ¶¶ 136-45.)  Pierce identified Godfrey as the shooter based on the older photo.  (*Id.* ¶ 138.)  The detectives separately drove with Cannon to a rail yard on the outskirts of Richmond to show him the photo lineup.  (*Id.* ¶¶ 140-42.)  Cannon said he could not identify the shooter based on the lineup, at which point Defendant Browne stated it was in Cannon's best interest to say Godfrey was the shooter.  (*Id.* ¶¶ 143-44.)  Subsequently, Cannon identified Godfrey from the lineup.  (*Id.* ¶ 145.)

At trial, Cannon also testified Godfrey was the shooter.  (*Id.* ¶ 151.)  As for Featherstone, he testified that during his interrogation, the detectives threatened to charge him with murder if he did not identify Godfrey as the shooter.  (*Id.* ¶ 158.)  Though Featherstone's recorded statement to the police identified Godfrey, in open court, he explained the statement was coerced and testified he did not know who the shooter was.  (*Id.* ¶¶ 159-60.)  A Contra Costa County jury convicted Godfrey of murder and attempted robbery.

## B.    Vacating Godfrey's Convictions

In 1995, Holman was shot and killed in Richmond, and Cannon eventually learned of his death.  (*Id.* ¶¶ 181, 183.)  Years later, in 2006, Godfrey's sister, Shanta King, confronted Cannon regarding his false testimony, and no longer fearing retribution by Holman, Cannon admitted he lied on the stand.  (*Id.* ¶¶ 184-89.)  Godfrey began building a case for exoneration, and in 2012, a private investigator re-interviewed Pierce.  (*Id.* ¶¶ 192-93.)  During this interview, Pierce stated she was concerned she had identified the wrong man as the shooter, and the events of that morning

United States District Court
Northern District of California

happened so fast, with numerous individuals, that it was hard for her to clearly remember each of them. (*Id.* ¶¶ 194-95.) Further, she recalled the assistant district attorney prosecuting the case and Defendant Trujillo telling her Godfrey may look different in the courtroom than she remembered—he might be bigger and taller. (*Id.* ¶¶ 196-97.)

Godfrey contacted the Contra Costa County Public Defender, which in turn contacted the District Attorney's Conviction Integrity Unit. (*Id.* ¶¶ 198-99.) During the process of reinvestigating the case, the government again interviewed Pierce, at which time she disavowed her conversation with the private investigator and insisted her identification of Godfrey at trial was correct. (*Id.* ¶ 200.) Taking into account Cannon's recanted testimony, and the further investigation into the case, Godfrey filed a motion to vacate a wrongful conviction, and the District Attorney filed a motion for re-sentencing pursuant to California Penal Code § 1172.1. (ECF 23-2 at 4.) As the government stated during those proceedings:

> The People move pursuant to section 1172.1 that the defendant's sentence be recalled and the convictions vacated and reinstated to status quo. At which time the People will be moving to amend the complaint to add a Count 3 in voluntary manslaughter pursuant to Penal Code section 192 on the same date and location as previously alleged in Count 1. Additionally the People move to amend to add an enhancement to Count 3 pursuant to Penal Code section 12022.5(b)(1) as written at the time of the offense in 1992.

(*Id.* at 17.) The court then granted the motion, vacating the original conviction and sentence. (*Id.* at 18.) The prosecution subsequently amended the criminal complaint to include a Count 3 for voluntary manslaughter, and the court dismissed Count 1 for murder. (*Id.* at 17, 24.) Godfrey pled no contest to Counts 2 and 3 for attempted robbery and voluntary manslaughter, respectively. (*Id.* at 19-22.) The court sentenced Godfrey to 24 years imprisonment, and since he had already served 31 years, he was released with a two-year parole period. (*Id.* at 21.) Godfrey waived his excess credits for time served that might have otherwise reduced the parole period, as part of his plea agreement. (*Id.*)

**C.    Allegations Against the City of Richmond**

Godfrey alleges Defendants Browne and Trujillo were members of an all-white faction within the Richmond Police Department that referred to itself as "the Cowboys." (ECF 1 ¶ 13,

48.)  Throughout the 1970s and 1980s, the Cowboys became known for their brutality.  (*Id.* ¶¶ 14, 49.)  For instance, "[i]n 1983, the San Francisco Examiner published a five-part exposé on police violence in Richmond, which included an article on the Cowboys. That article described the Cowboys as 'a group of white policemen' at the RPD who had 'taken the law into their own hands, often violating police regulations and the rights of citizens.'"  (*Id.* ¶ 49.)  The Complaint then alleges various instances of violent encounters instigated by Defendant Browne, including an incident in which he was found "'clubb[ing] [a woman] eight or 10 times,' including on her head, before striking and kicking the woman's 16-year-old daughter, 'who still bore 47 stitches from a childbirth eight days earlier.'"  (*Id.* ¶ 58.)  Other alleged instances of violence by Defendants Browne and Trujillo included shotgun shootings, beatings, and using mace on individuals who were never ultimately charged with a crime.  (*Id.* ¶¶ 58-62.)

The Complaint also alleges prior excessive force by Defendant Browne against Cannon. Approximately two years before the 1992 murder of Norfleet, Defendant Browne stopped Cannon—then 15 years old—and pulled a gun on him.  (*Id.* ¶¶ 116-17.)  Defendant Browne then allegedly stated, "You don't want to fuck with me. I'm a crazy fucking white man," before searching Cannon.  (*Id.* ¶ 117.)  Ultimately, no contraband was discovered, and Defendant Browne departed without taking him into custody.  (*Id.* ¶ 118.)

Further, Defendant Browne allegedly coerced a key witness in a different 1992 homicide case to testify falsely.  (*Id.* ¶¶ 164-65.)  A witness in the case of *People v. Benjamin Toscano* claimed Defendant Browne showed him a photo lineup, and before the witness could make an identification, Defendant Browne stated: "We know who it is . . . .  [T]hat's him right there.  His name is Ben Toscano and he's the shooter.  Okay?"  (*Id.* ¶¶ 167-69.)

Godfrey alleges these acts were known to the City of Richmond and the City demonstrated a policy of deliberate indifference to the constitutional violations committed by its officers. (*Id.* ¶¶ 234-36.)  As alleged, Defendants Browne and Trujillo were never disciplined prior to the investigation of Norfleet's murder, and the City's failure to discipline resulted in "dangerous and lawless conduct perpetrated by [its] officers."  (*Id.* ¶¶ 237-39.)

**LEGAL STANDARD**

"To survive a motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Iqbal* and *Twombly*, plaintiffs' allegations must suggest that their claim has at least a plausible chance of success." *Levitt v. Yelp! Inc*., 765 F.3d 1123, 1134-35 (9th Cir. 2014) (cleaned up). The district court must assume that the plaintiff's allegations are true and draw all reasonable inferences in his favor. *Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220 (9th Cir. 2022). However, the court need not construe conclusory statements or unreasonable inferences as true. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

**DISCUSSION**

**I.    REQUESTS FOR JUDICIAL NOTICE**

Pursuant to Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Courts often take judicial notice of "matters of public record" and court filings. *Reyn's Pasta Bella, LLC v. Visa USA, Inc*., 442 F.3d 741, 746 n.6 (9th Cir. 2006). Both Godfrey and Defendants request the Court take judicial notice of various filings and transcripts from Godfrey's 2023 plea and resentencing. (ECF 21-1, 23.) These documents bear on the question of whether Godfrey's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). The parties' respective interpretations of these documents directly conflict: Defendants claim they show Godfrey's 1993 convictions were not vacated, and Godfrey claims they show the convictions were, in fact, vacated.

Upon reviewing the judicially noticed material, the Court determines the facts contained therein are not subject to reasonable dispute, as the Court explains in the analysis of *Heck*, *infra*. Therefore, the Court takes judicial notice of ECF 21-2, 21-3, 21-4, 21-5, 23-1, 23-2, and 23-3. However, assuming *arguendo*, the matters were subject to reasonable dispute, the Court's conclusion regarding *Heck*, *infra*, would not change. If the Court declined to take judicial notice of the facts, Defendants would have no basis for their *Heck* challenge grounded solely in the Complaint's allegations.

## II.    SECTION 1983 CLAIMS

To state a claim under 42 U.S.C. § 1983, a plaintiff must plausibly allege "a violation of his constitutional rights and show that the defendant's actions were taken under color of state law." *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 921 (9th Cir. 2011) (citation omitted). The parties do not dispute Godfrey has alleged Defendants acted under color of state law when investigating the murder of Harvey Norfleet. Rather, Defendants argue Godfrey has failed to allege a violation of his constitutional rights.

### A.    *Heck v. Humphrey*

Prior to addressing the merits of the alleged constitutional violations, Defendants assert Godfrey's claims under Section 1983 are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck*, the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . .

*Id.* at 486-87. The Ninth Circuit, in *Jackson v. Barnes*, further elaborated this standard. 749 F.3d 755 (9th Cir. 2014). There, the plaintiff had been convicted of murder, but a federal court granted his habeas petition after determining he had been improperly *Mirandized*. *Id.* at 759. Jackson was retried without use of the improperly obtained inculpatory testimony and was once again convicted. *Id.* Prior to that second conviction, Jackson sued under Section 1983 for violations of his constitutional rights that ultimately resulted in the vacatur of his first conviction. *Id.* Considering *Heck*, the Ninth Circuit held Jackson was not barred from suit, even though he had ultimately been convicted for the same crime on retrial. *Id.* at 760. The Section 1983 suit would not imply "the invalidity of his second conviction" because the constitutional violations only happened during the first trial, not the second. *Id.*

The instant case is analogous to *Jackson*. In 2023, the state court vacated Godfrey's convictions for murder and attempted robbery (ECF 23-2 at 18), which invalidated those

7

convictions under *Heck*.  *See Roberts v. City of Fairbanks*, 947 F.3d 1191, 1198 (9th Cir. 2020) (holding vacatur by state court pursuant to settlement agreement constituted an exception to *Heck*). Though Godfrey pled "no contest" to new charges of attempted robbery and voluntary manslaughter based on the same 1993 crime (ECF 23-2 at 19-22), the second conviction and sentencing do not bar his claims here.  As in *Jackson*, Godfrey alleges constitutional violations related to the 1993 conviction only.  Any judgment on these claims would not invalidate the 2023 conviction because none of the alleged violations implicated that proceeding.  *See also Poventud v. City of New York*, 750 F.3d 121, 134 (2d Cir. 2014) (permitting Section 1983 claims to advance where the original conviction was vacated, and the plaintiff subsequently pled guilty to a lesser charge); *Taylor v. Cnty. of Pima*, 913 F.3d 930, 935 (9th Cir. 2019) (holding *Heck* did not bar Section 1983 claim based on vacatur of first conviction and subsequent plea agreement for reconviction, though the claim was ultimately dismissed on separate grounds).

Defendants' counterarguments rely on a misunderstanding of prior proceedings.  Per the transcript of the April 21, 2023 hearing before the Contra Costa County Superior Court, the government requested that Godfrey's convictions be "vacated and reinstated to status quo." (ECF 23-2 at 17.)  The court granted the motion and vacated the convictions.  (*Id.* at 18.)  Godfrey then pled "no contest" to charges of manslaughter and attempted robbery, with statutory enhancements.  (*Id.* at 19-21.)  Had the original conviction for attempted robbery remained—as Defendants argue—he could not have entered a new plea of "no contest" to that count.  Though Defendants suggest only the original murder conviction was vacated, that interpretation fails to recognize the distinction between dismissal and vacatur in the proceedings.  (ECF 24 at 9.)  The state court agreed the criminal complaint would be amended by the prosecution to include a new Count 3 for voluntary manslaughter, prior to Godfrey's plea.  (ECF 23-2 at 17, 24.)  Of the three counts in the newly amended complaint—murder, attempted robbery, and voluntary manslaughter—the court then dismissed Count 1, and Godfrey pled "no contest" to Count 2 (attempted robbery) and Count 3 (voluntary manslaughter).  In sum, the vacatur applied to the original Counts 1 and 2, the basis of the 1993 conviction.  The dismissal applied only to Count 1 of the amended complaint, *after* vacatur of the original convictions.  Accordingly, *Heck* does not

1   bar Godfrey's claims since the original 1993 convictions were vacated.

2           Finally, Defendants argue, without support, that *Heck* bars the instant claims because they

3   "challenge the factual basis of his *current* convictions." (ECF 24 at 11 (emphasis in original).)

4   Since the 2023 convictions were based on a plea of "no contest" to allegations, which included

5   Godfrey's involvement in the murder of Norfleet, Defendants assert the factual basis is the same

6   as the 1993 convictions. (*Id.*) But Godfrey's claims do not mandate the factfinder consider actual

7   innocence. While a malicious prosecution claim requires termination of the original case in the

8   plaintiff's favor, the Section 1983 claims here have no such requirement. *See Jackson*, 749 F.3d at

9   761 n.3 (citing *DiBlasio v. New York*, 102 F.3d 654, 657 (2d Cir.1996), and *Poventud*, 750 F.3d at

10  130-33). Godfrey does not need to ultimately prove he did not murder Norfleet, or that he was not

11  involved in the attempted robbery. He need only show he suffered a constitutional violation by

12  officials acting under color of state law. *Florer*, 639 F.3d at 921. Even if he prevails on his

13  Section 1983 claims, a judgment in his favor would leave his 2023 conviction, and its factual

14  basis, undisturbed.

15          For these reasons, the Court determines *Heck* does not bar Godfrey's claims.

16          **B.    Fabrication of Evidence**

17          Having resolved Defendants' *Heck* challenge, the Court turns to the alleged constitutional

18  violations that underlie Godfrey's claims. He first asserts the detectives investigating Norfleet's

19  murder fabricated evidence against him in violation of the Fourteenth Amendment. (ECF 1

20  ¶¶ 217-20.) To advance a Section 1983 claim based on fabrication of evidence, the plaintiff must

21  plausibly allege "that (1) the defendant official deliberately fabricated evidence and (2) the

22  deliberate fabrication caused the plaintiff's deprivation of liberty." *Caldwell v. City & Cnty. of*

23  *San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018) (citation omitted). The Ninth Circuit

24  recognizes two theories of fabrication: "(1) [d]efendants continued their investigation . . . despite

25  the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants

26  used investigative techniques that were so coercive and abusive that they knew or should have

27  known that those techniques would yield false information." *Id.* at 1112 (citing *Devereaux v.*

28  *Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc)). Godfrey does not allege any facts to

1   permit a plausible inference the detectives knew or should have known he was innocent. Rather,

2   he proceeds on the second theory, that the detectives used investigative techniques in questioning

3   Cannon that were so coercive, they knew or should have known the techniques would yield false

4   information. (ECF 1 ¶¶ 217-18.)

5       Godfrey has plausibly alleged facts to support a fabrication of evidence claim under this

6   theory. The claim turns on two primary allegations related to the detectives' treatment of witness

7   Michael Cannon. First, Godfrey alleges the detectives threatened Cannon during an unrecorded

8   portion of his interview after he requested to speak to an attorney. (*Id.* ¶ 121, 124-26.) The

9   detectives stated Cannon could be charged as an accessory to murder and spend his life in prison if

10  he did not identify the shooter. (*Id.* ¶ 126.) Second, the following day, the detectives once again

11  picked up Cannon from his residence and drove him to a remote railyard on the outskirts of

12  Richmond. (*Id.* ¶¶ 140-41.) At the railyard, the detective allegedly showed Cannon a photo

13  lineup so that he could identify the shooter. (*Id.* ¶ 142.) Cannon stated he could not identify

14  anyone from the lineup, and in response, Defendant Browne told him that it was in his best interest

15  to identify Godfrey as the shooter. (*Id.* ¶ 144.) Godfrey alleges these techniques, including threats

16  and suggestions of leniency, were coercive, such that the detectives should have known they

17  would elicit false information from Cannon. (*Id.* ¶¶ 217-18.) These allegations permit a

18  reasonable inference that the detectives fabricated evidence during the investigation.

19      Indeed, the allegations resemble the facts in *Gantt v. City of Los Angeles*, 717 F.3d 702

20  (9th Cir. 2013). There, the Ninth Circuit permitted a Section 1983 fabrication claim to advance on

21  a theory of witness coercion. The San Francisco police had threatened to charge the witness with

22  the murder they were investigating if he did not provide information. *Id.* at 708. Further, the

23  officers had shown the witness certain materials and instructed him not to tell anyone. *Id.* These

24  factors were compounded by the fact the witness had been awake for two days prior because of his

25  drug usage, though the officers were not aware he was high during the interview. *Id.* Here,

26  Godfrey alleges the detectives threatened to charge Cannon with accessory to murder and that he

27  would spend his life in prison—an inaccurate and misleading statement of the potential sentence

28  that could accompany such a conviction. *See, e.g.*, Cal. Penal Code § 33 ("Except in cases where

United States District Court
Northern District of California

United States District Court
Northern District of California

1  a different punishment is prescribed, an accessory is punishable by a fine not exceeding five

2  thousand dollars ($5,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a

3  county jail not exceeding one year, or by both such fine and imprisonment.").  In addition, the

4  detectives instructed Cannon—after he stated he could not identify the shooter in a photo lineup—

5  that it was in his best interest to identify Godfrey.

6          The factual distinction between *Gantt* and the allegations here lies in the witness's drug

7  use.  But, the officers in *Gantt* were not aware he was high during the interview, which suggests

8  this factor was not critical to the Ninth Circuit's holding.  Rather, the circumstances, as a whole,

9  indicated a jury could find the officers had fabricated evidence.  Similarly, the circumstances

10  alleged here permit the claim to advance: 1) the detectives did not record Cannon's interrogation;

11  2) they threatened to charge him; 3) they made inaccurate statements about the potential criminal

12  consequences he could face; 4) they drove him to an isolated location, alone; 5) they ignored his

13  initial statements that he could not identify the shooter from the photo lineup; and 6) they insisted

14  it was for Cannon's own benefit that he identify Godfrey as the shooter.  Such allegations fall

15  within the bounds of *Gantt*.  *See, e.g.*, *Ciria v. City & Cnty. of San Francisco*, No. 4:22-CV-

16  07510-KAW, 2024 WL 2306285, at *7 (N.D. Cal. May 21, 2024) (citing *Gantt* and denying

17  dismissal of a fabrication of evidence claim where the officers threatened to charge a witness as an

18  accessory unless he provided information).

19          Defendants raise two arguments in response—neither persuades.  First, they assert the

20  detectives' statements that Cannon could be charged as an accessory to murder and spend his life

21  in prison were not coercive based on *United States v. Okafor*, 285 F.3d 842 (9th Cir. 2002), and

22  *United States v. Bautista-Avila*, 6 F.3d 1360 (9th Cir. 1993).  Both are distinguishable.  In those

23  cases, the Ninth Circuit held a criminal suspect's confession was not coerced, even when the

24  interrogating officers shared the potential penalties the suspect could face if convicted of the

25  crime.  Neither case dealt with a Fourteenth Amendment fabrication of evidence claim regarding a

26  third-party witness.  Rather, the court addressed the standard for coerced confessions under the

27  Fifth Amendment's protection against self-incrimination.  The Fifth Amendment requires the

28  confession be "free and voluntary," *Malloy v. Hogan*, 378 U.S. 1, 7 (1964), which differs from the

1    "would yield false information" standard laid out in *Devereaux*.  Moreover, the Ninth Circuit has

2    held that fabrication of evidence claims differ from Fifth Amendment claims such that a coerced

3    confession is not cognizable under the fabrication of evidence standard.  *Hall v. City of Los*

4    *Angeles*, 697 F.3d 1059, 1069 (9th Cir. 2012) ("In fact, all of our published cases that follow

5    *Devereaux* concern interview techniques used to elicit evidence from third-party witnesses, not the

6    coerced interrogation of a suspect.").  So, *Okafor* and *Bautista-Avila* are inapposite.

7        Second, Defendants counter that because Holman threatened to kill Cannon if he identified

8    Holman as the shooter, and instructed Cannon to blame Godfrey, the "allegedly coercive

9    techniques could not have yielded the false information."  (ECF 24 at 16.)  The Court interprets

10   this as a challenge to Godfrey's causation allegations.  To start, the Court cannot find, as a matter

11   of law, that Cannon would have testified falsely regardless of the detectives' actions.  Indeed, the

12   Plaintiff avers that the detectives' alleged conduct was the reason for Cannon's false testimony.

13   (ECF 1 ¶¶ 131, 145.)  Though Godfrey alleges Holman threatened Cannon, one cannot conclude

14   Cannon surely would have testified Godfrey was the shooter absent the detectives' intervention.

15   As this is a 12(b)(6) motion, the Court must draw inferences in favor of the plaintiff and does not

16   resolve these kinds of factual disputes.  *See Shields,* 32 F.4th at 1220.

17       **C.    *Brady* Violation**

18       Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to an

19   accused upon request violates due process where the evidence is material either to guilt or to

20   punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87

21   (1963).  "*Brady* suppression occurs when the government fails to turn over even evidence that is

22   known only to police investigators and not to the prosecutor."  *Youngblood v. West Virginia*, 547

23   U.S. 867, 869-70 (2006) (per curiam) (citation and quotation marks omitted).  To state a claim

24   under *Brady*, the plaintiff must plausibly allege "(1) the withheld evidence was favorable either

25   because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the

26   government, and (3) the nondisclosure prejudiced the plaintiff."  *Gantt*, 717 F.3d at 709 (citation

27   omitted).  "Evidence is material if there is a reasonable probability that, had it been disclosed to

28   the defense, the outcome of the trial would have been different."  *Hovey v. Ayers*, 458 F.3d 892,

United States District Court
Northern District of California

916 (9th Cir. 2006) (citation omitted).  Defendants do not specifically challenge Godfrey's *Brady* claim in their motion, except in so far as it is barred by *Heck* or is duplicative of the fabrication of evidence claim.  (ECF 24 at 9-10, 16 n.7.)  These arguments are unpersuasive.

To start, the Court rejects Defendants' *Heck* argument for the reasons stated in Section II.A., *supra*.  Second, in so far as Defendants characterize the *Brady* claim as duplicative of the fabrication of evidence claim, that proposition is inaccurate.  *Brady* and Fourteenth Amendment fabrication of evidence are not coextensive.  The standard for fabrication of evidence differs from the *Brady* standard, meaning a *Brady* claim may exist even if the factual circumstances surrounding the detectives' investigation do not amount to fabrication.  Here, the undisclosed statements from the detectives, and Mr. Cannon's initial failure to identify a shooter from the photo lineup could have plausibly undermined Mr. Cannon's credibility—a basis for a *Brady* violation.

### D.    Waiver of Damages

Next, Defendants assert that Godfrey cannot plausibly allege damages for the 7 years of incarceration that exceeded the 24 years of his 2023 conviction.  (ECF 21 at 20.)  Pursuant to his 2023 plea agreement, Godfrey consented to "waive any excess credits to allow for a two-year period of parole."  (ECF 23-2 at 21.)  As the superior court explained:

> Mr. Godfrey, because you are being resentenced to 24 years, and you have served over 31, it may be that the Department of State Corrections will determine that you have served more time than what you were sentenced to. So what is being proposed as part of this plea is that you are waiving any excess credits to allow for a two-year period of parole.

(*Id*.)  Defendants contend this waiver of credits to permit a two-year parole period also constitutes a waiver of damages under Section 1983.  The Court is not persuaded.

The only legal basis supplied by Defendants to support this contention is *Taylor v. Cnty. of Pima*, 913 F.3d 930 (9th Cir. 2019).  In *Taylor*, the plaintiff had been convicted of 28 counts of felony murder for starting a deadly fire.  *Id.* at 932.  Decades later, the conviction was vacated based on new evidence, and the plaintiff agreed to a new plea agreement on the same charges but for a sentence of time served.  *Id.*  The plaintiff then sued under Section 1983 based on alleged

United States District Court
Northern District of California

constitutional violations that occurred during his first trial.  *Id.*  Citing *Jackson*, 749 F.3d 755 (9th Cir. 2014), the Ninth Circuit held Taylor could not seek compensatory damages for his time incarcerated because his new sentence was not less than the years he served for his original conviction.  *Id.* at 936.  The court reasoned: "when a valid, unchallenged conviction and sentence justify the plaintiff's period of imprisonment, then the plaintiff cannot prove that the challenged conviction and sentence caused his imprisonment and any resulting damages."  *Id.*  *Taylor* has little, if any, bearing on Defendants' argument.  *Taylor* did not involve in-custody credits that could affect parole upon release from custody.  It did not discuss how those credits might affect damages under Section 1983.  Further, unlike in *Taylor*, Godfrey was not resentenced to time served—his new sentence was for 24 years when he had already served 31 years.  On a motion to dismiss, Defendants bear the burden of showing, as a matter of law, that damages are unavailable to Plaintiff, and he cannot state a claim.  *See Ebin v. InVision App, Inc.*, No. 20-CV-05163-RS, 2020 WL 11564644, at *5 (N.D. Cal. Sept. 21, 2020) ("On a motion to dismiss, the burden is on the defendant to show that the plaintiff has failed to state a claim." (citing *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)).  They have not done so.

Since Defendants have supplied no legal authority for interpreting the waiver of in-custody credits as a waiver of damages under Section 1983, the Court rejects this argument.

### III.  QUALIFIED IMMUNITY

Having determined Godfrey plausibly alleges fabrication of evidence and *Brady* claims, the Court next assesses Defendants' contention that they are entitled to qualified immunity.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  To determine a right was clearly established does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Indeed, "[i]t's not enough that the legal answer be 'suggested by then-existing precedent'; the answer must be 'so well defined' that 'the legal principle clearly prohibit[s] the officer's conduct in the particular circumstances

14

1   before him.'"  *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1166 (9th Cir. 2022) (citing *District of*

2   *Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).  In adjudicating an alleged constitutional violation,

3   the Court may consider whether qualified immunity bars suit before addressing the constitutional

4   claim on the merits.  *Pearson*, 555 U.S. at 236.

5       Defendants assert qualified immunity precludes Godfrey's claims, as there was no clearly

6   established law prohibiting the alleged conduct during the 1992 investigation.  (ECF 21 at 23-25.)

7   The Court addresses qualified immunity as to each claim.

8       **A.    Fabrication of Evidence**

9       Whether Defendants' alleged conduct is subject to qualified immunity turns on the Ninth

10  Circuit's holding in *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc).  There, the

11  court considered whether qualified immunity applied to law enforcement for Section 1983 claims

12  based on alleged fabrication of evidence during a 1994 investigation.  *Id.* at 1073-74.  The court

13  held "there is a clearly established constitutional due process right not to be subjected to criminal

14  charges on the basis of false evidence that was deliberately fabricated by the government."  *Id.* at

15  1074-75.  Noting the proposition was "virtually self-evident," the court looked to *Pyle v. Kansas*,

16  317 U.S. 213, 216 (1942), as a moment in which the constitutional right was clearly established.

17  *Id.* at 1075.

18      *Devereaux* answers the question of whether it was clearly established in 1992 that coercive

19  interview tactics—such as those alleged by Godfrey—violated a defendant's constitutional rights.

20  The Ninth Circuit cited *Pyle* as the basis for the clearly established right, which was itself decided

21  in 1942, five decades prior to the events at issue here.  *Devereaux*, 263 F.3d at 1075.  The Court

22  cannot, and will not, depart from this binding authority.  Moreover, the Court is not alone in

23  applying *Devereaux* to reject a qualified immunity defense to fabrication claims.  *See, e.g.*, *Ciria*,

24  2024 WL 2306285, at *1.

25      To counter, Defendants argue *Pyle* is not on point because, in the instant case, Cannon was

26  allegedly threatened by Holman to identify Godfrey as the shooter.  (ECF 24 at 17.)  This

27  argument is a non-starter.  As the Court discussed in Section II.B, *supra*, this assertion about

28  causation is at odds with the well pleaded allegations in the Complaint.  Godfrey alleges the

United States District Court
Northern District of California

1    detectives' conduct was coercive and resulted in the false information supplied by Cannon.  (ECF

2    1 ¶¶ 131, 145.)  The Court must accept these allegations as true for purposes of resolving this

3    motion.  *Shields*, 32 F.4th at 1220.  Further, it is unclear why this factual nuance should alter the

4    qualified immunity analysis.  There are no allegations indicating the detectives knew Holman had

5    threatened Cannon, and no allegations that Holman's threat impacted their treatment of Cannon in

6    any way.  Qualified immunity protects officers from liability except in circumstances where "the

7    law was sufficiently clear that every reasonable official would understand that what he is doing is

8    unlawful."  *Wesby*, 583 U.S. at 63 (internal quotations omitted).  The inquiry focuses on what

9    reasonable officers are expected to know about *their own* conduct.  And so, Holman's alleged

10   conduct has no bearing on what the detectives would have understood about the lawfulness of

11   their treatment of Cannon.

12        Consequently, the Court determines qualified immunity does not apply to Defendants'

13   alleged conduct and **DENIES** Defendants' motion to dismiss.

14        **B.**    ***Brady* Violation**

15        As for the *Brady* claim, Defendants did not address qualified immunity in either their

16   motion or reply.  Nevertheless, considering the merits, the Court is not persuaded qualified

17   immunity would apply to bar Godfrey's *Brady* claim.

18        "When the 'reliability of a given witness may well be determinative of guilt or innocence,'

19   nondisclosure of evidence affecting credibility falls within [*Brady*]."  *Giglio v. United States*, 405

20   U.S. 150, 154 (1972) (citation omitted).  Evidence going to a key witness's credibility, particularly

21   evidence of any understanding or agreement as to future leniency, is exculpatory and must be

22   disclosed to a criminal defendant.  *Id.* at 154-55.  Godfrey alleges the detectives threatened

23   Cannon with prosecution as an accessory to murder unless he provided information on the shooter.

24   (ECF ¶¶ 124-26.)  They then allegedly told him it would be in his best interest to identify Godfrey.

25   (*Id.* ¶¶ 140-45.)  These allegations permit a reasonable inference that the detectives used coercive

26   tactics and indicated potential leniency toward Cannon, should he identify Godfrey as the shooter.

27   Such information would undermine the credibility of Cannon's identification at trial, falling

28   squarely within *Giglio*.

United States District Court
Northern District of California

1  Accordingly, the Court determines qualified immunity does not bar Godfrey's *Brady* claim

2  and **DENIES** Defendants' motion to dismiss.

3  ## IV.   *MONELL* CLAIM

4  As established in *Monell v. Dep't of Soc. Servs. of City of New York*, municipalities and

5  local governments are subject to suit under Section 1983.  436 U.S. 658, 690.  To advance his

6  *Monell* claim, Godfrey must plausibly allege "the local government had a deliberate policy,

7  custom, or practice that was the moving force behind the constitutional violation [he] suffered."

8  *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) (citation omitted).  The

9  Ninth Circuit recognizes three different theories of *Monell* liability:

> First, a local government may be liable if "execution of a
> government's policy or custom, whether made by its lawmakers or by
> those whose edicts or acts may fairly be said to represent official
> policy, inflict[ed] the injury."  Second, a local government can fail to
> train employees in a manner that amounts to "deliberate indifference"
> to a constitutional right, such that "the need for more or different
> training is so obvious, and the inadequacy so likely to result in the
> violation of constitutional rights, that the policymakers of the city can
> reasonably be said to have been deliberately indifferent to the need."
> Third, a local government may be held liable if "the individual who
> committed the constitutional tort was an official with final policy-
> making authority or such an official ratified a subordinate's
> unconstitutional decision or action and the basis for it.

17  *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802-03 (9th Cir. 2018) (internal citations

18  omitted).  Godfrey's allegations fall within the second theory, namely that the City of Richmond

19  exhibited "deliberate indifference" to his constitutional rights through its "failure to investigate

20  and discipline employees in the face of widespread constitutional violations."  *Id.* at 803.  A

21  policy, custom, or practice of deliberate indifference may be "inferred from widespread practices

22  or 'evidence of repeated constitutional violations for which the errant municipal officers were not

23  discharged or reprimanded.'"  *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011)

24  (citation omitted).

25  Here, Godfrey has not plausibly alleged a policy, custom, or practice related to witness

26  coercion and failure to disclose exculpatory evidence—the constitutional violations he suffered.

27  As the Supreme Court held in *Connick v. Thompson*, "[a] pattern of similar constitutional

28  violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference

United States District Court
Northern District of California

United States District Court
Northern District of California

1    for purposes of failure to train." 563 U.S. 51, 62 (2011) (citation omitted). There, the Court noted

2    the prior constitutional violations had to be similar because, absent "notice that a course of training

3    is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a

4    training program that will cause violations of constitutional rights." *Id.* Though Godfrey alleges a

5    failure-to-discipline claim, the Ninth Circuit has considered such claims a species of failure-to-

6    train claims. *Rodriguez*, 891 F.3d at 803. Indeed, the "deliberate indifference" theory of liability

7    that characterizes a failure to train may be proved "through evidence of a 'failure to investigate

8    and discipline employees in the face of widespread constitutional violations.'" *Id.* Despite the

9    difference in how the *Monell* theory is framed, the reasoning in *Connick* still applies. Both failure

10   to train and failure to discipline are ultimately theories grounded in omission—the municipality

11   did not take an action it should have. In so far as the Supreme Court has recognized a "pattern of

12   similar constitutional violations" is required to put decisionmakers on notice of deficient training,

13   so too would a pattern of similar violations be required to put decisionmakers on notice of

14   deficient discipline. Much like with training, a municipality may be properly disciplining officers

15   for certain violations but not others. As in *Connick*, specificity matters to show "continued

16   adherence to an approach [policymakers] know or should know has failed to prevent tortious

17   conduct . . . ." *Connick*, 563 U.S. at 62.

18       Godfrey's allegations of prior misconduct by the Cowboys, including Defendants Trujillo

19   and Browne, involve situations of arguably excessive force. (ECF 1 ¶¶ 46-62.) The only

20   allegation of prior misconduct related to either witness coercion or *Brady* violation involved

21   Defendant Browne, who is alleged to have improperly instructed a witness to identify a certain

22   suspect from a photo lineup. (*Id.* ¶¶ 164-69.) This lone allegation does not permit a plausible

23   inference that the City of Richmond had a policy of deliberate indifference, and that indifference

24   caused Godfrey's injuries.

25       In opposition, Godfrey relies on *Hayes v. Riley*, where the district court observed *Connick*

26   was distinguishable because it was not a failure-to-discipline claim. 525 F. Supp. 3d 1118, 1121

27   (N.D. Cal. 2020). The court reasoned:

28           . . . [T]he prior violations in *Connick* were committed by different

18

1

2

3

4

5

6

actors in different contexts, and were being used to advance an office-wide failure to train theory.  The Court did not address a situation where, like here, past constitutional violations were allegedly committed by the same officer in the context of a failure to discipline claim. If the same officer repeatedly violates the constitutional rights of a city's residents, and the city is on notice of these violations and fails to properly discipline the officer, by definition the city is deliberately indifferent to the likelihood that the officer will continue to commit constitutional violations in the future.  In a case like that, it typically will not matter whether the prior acts of misconduct were similar or different.

*Id.* (internal citations omitted).  Godfrey places particular emphasis on the court's conclusion, namely that the similarity of prior misconduct does not matter for a failure-to-discipline claim. The Court is not persuaded to follow *Hayes* on this point.  To start, the district court did not cite any legal authority for that specific conclusion.  And as explained above, the similarity of the predicate acts matters because it puts the municipality on notice of a deficiency and the corrective action it should take.  Indeed, both Ninth Circuit Court of Appeals decisions cited by Godfrey on this issue involved policies, customs, or practices of *specific* constitutional violations that were the *same* as the constitutional violations suffered by the plaintiff.  *See Rodriguez*, 891 F.3d at 803 (policy, custom, or practice of excessive force and the plaintiff had suffered a beating by the police); *Larez v. City of Los Angeles*, 946 F.2d 630, 634, 647 (9th Cir. 1991) (policy, custom, or practice of excessive force and the plaintiff suffered an unreasonable search executed through excessive force).  These cases reveal a causation problem with Godfrey's allegations: the Complaint does not explain how a history of excessive force by the Cowboys, and Richmond's deliberate indifference to that excessive force, resulted in *different* constitutional violations, such as fabrication of evidence and failure to disclose *Brady* material.  Make no mistake, the allegations of brutality perpetrated by the Cowboys are disturbing.  However, absent additional allegations establishing a policy, custom or practice of witness coercion or *Brady* violations, the claim cannot advance.  However, because Godfrey may be able to allege additional facts sufficient to state a claim, the Court cannot conclude amendment would be futile, and therefore dismisses the *Monell* claim with leave to amend.  *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

1    **V.     MOTION TO STRIKE**

2         Finally, the Court considers Defendant's motion to strike portions of Godfrey's complaint.

3    Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an

4    insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  "The

5    function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise

6    from litigating spurious issues by dispensing with those issues prior to trial . . . ."  *Whittlestone,*

7    *Inc. v. Handi-Craft Co*., 618 F.3d 970, 973 (9th Cir. 2010) (citation omitted).  "Motions to strike

8    are generally disfavored" and "should only be granted if the matter sought to be stricken clearly

9    has no possible bearing on the subject matter of the litigation."  *Gutzalenko v. City of Richmond*,

10   No. 22-cv-02130, 2024 WL 1141689, at *2 (N.D. Cal. Mar. 15, 2024).

11        Defendants argue the Complaint's references to the Cowboys are irrelevant to the *Monell*

12   claim, so they should be stricken.  (ECF 21 at 29-30.)  The Court disagrees.  In dismissing the

13   *Monell* claim, the Court determined the current allegations regarding the Cowboys' use of

14   excessive force were not sufficient to plausibly state a claim.  *See* Section IV, *supra*.  This does

15   not mean the allegations are immaterial and have "no possible bearing on the subject matter of the

16   litigation."  *Gutzalenko*, 2024 WL 1141689, at *2.  Indeed, the allegations may ultimately become

17   relevant to theories of witness coercion involving threats—topics directly related to Godfrey's

18   fabrication of evidence claim.  Even so, the Court need not wade further into hypotheses about the

19   various ways these allegations may operate in the case.  Rather, it is enough that the Court "may

20   not resolve 'disputed and substantial factual or legal issue[s] in deciding . . . a motion to strike.'"

21   *Whittlestone, Inc*., 618 F.3d at 973.

22        So, the Court **DENIES** the motion to strike.

23                                    **CONCLUSION**

24        For the reasons stated above, the Court **GRANTS** the motion to dismiss the *Monell* claim,

25   with leave to amend.  Further, the Court **DENIES** the motion to dismiss the fabrication of

26   //

27   //

28   //

United States District Court
Northern District of California

20

evidence and *Brady* claims, and **DENIES** the motion to strike. Should Godfrey choose to amend his *Monell* claim, an amended complaint shall be filed no later than September 15, 2025.

     **IT IS SO ORDERED.**

Dated: August 18, 2025

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**